**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **UNILOC 2017 LLC AND UNILOC USA INC.,** | § § § | |
| *Plaintiffs*, | § § | Civil Case No. 2:18-cv-495-JRG-RSP |
| v. | § § | |
| **GOOGLE LLC,** | § § | |
| *Defendant.* | § § | |

**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FOR
LACK OF STANDING AND IMPROPER VENUE
<u>UNDER RULES 12(B)(1), 12(B)(3) AND 12(B)(6)</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

I.    STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1)) ...................................... 3

II.   FACTUAL BACKGROUND ........................................................................................ 4

      A.    The Parties ............................................................................................. 4

      B.    The Complaints ....................................................................................... 4

III.  PLAINTIFFS LACK STANDING TO SUE ..................................................................... 5

      A.    Several Agreements Have Fractured Ownership of the Patents-in-Suit. ................. 6

      B.    Uniloc USA Has Never Had Standing to Sue on the Asserted Patents. .................. 7

      C.    Uniloc 2017 Does Not Have Standing to Sue Either. ................................. 8

            1.    Fortress's Right to Sub-License the Asserted Patents Deprives
                  Uniloc 2017 of Standing ................................................................. 8

                  a.    Multiple "Events of Default" Under the Uniloc Lux-Fortress
                        Agreement Have Triggered Fortress's Right to Sub-License. .......... 9

                  b.    Fortress's Right to Sub-License Survived Both Uniloc Lux's
                        Attempt to Cure and the Parties' Termination of the
                        Agreement. ..................................................................... 10

                  c.    Fortress's Right to Sub-License the Asserted Patents
                        Deprives Uniloc 2017 of Standing. ..................................... 11

            2.    Uniloc 2017's Agreement with CF Uniloc Also Deprives Uniloc
                  2017 of Standing. ..................................................................... 12

      D.    If the Court Does Not Dismiss, The Case Should Be Stayed Pending
            Standing Discovery. ............................................................................. 12

IV.   VENUE IS NOT PROPER IN THE EASTERN DISTRICT OF TEXAS. ........................ 13

      A.    Google Has No "Regular and Established Place Of Business" In This
            District. ............................................................................................. 13

            1.    GGC Servers Hosted by Third-Party ISPs Do Not Give Rise to a
                  "Regular and Established Place of Business" in this District. .................... 14

                  a.    GGC Servers Are Not Places of Business and None Are Still
                        Operating in This District. ............................................... 15

                  b.    GGC Servers Are Not "Physical Places" Of Business. ................ 16

                  c.    There Is Nothing "Regular and Established" About GGC
                        Servers. ....................................................................... 19

                  d.    The ISP Facilities Hosting GGC Servers Are Not the "Place
                        of" Google. ................................................................... 20

# TABLE OF CONTENTS
(continued)

**Page**

2.     Uniloc's Remaining Venue Allegations Fare No Better in Locating a "Regular and Established Place of Business" in This District...................21

     a.     Google Fi and Google Voice .........................................................22

     b.     Third-Party "Megaport" Facilities and GCI ..................................23

     c.     Repair Centers.................................................................................24

     d.     Other Google Services ....................................................................24

     e.     Operations Outside the District and Pre-Suit................................25

B.     Uniloc Cannot Establish a Nexus Between Alleged Acts of Infringement and Google's Purported "Regular and Established Place of Business."................26

C.     Uniloc Insufficiently Alleged An Act Of Infringement In This District. ...............28

V.     ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA ...................................................................29

VI.     CLAIMS OF PRE-SUIT INDIRECT INFRINGEMENT  SHOULD BE DISMISSED FOR FAILURE TO ALLEGE KNOWLEDGE OF THE ASSERTED PATENT .....................................................................................................................30

CONCLUSION...................................................................................................................30

## TABLE OF AUTHORITIES

**Page**

<span style="font-variant: small-caps">Cases</span>

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
  2017 WL 3668597 (D. Del. Aug. 24, 2017) ..............................................................8

*Azure Networks, LLC v. CSR PLC*,
  771 F.3d 1336 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846
  (2015)..........................................................................................................................12

*Babbage Holdings, LLC v. Activision Blizzard, Inc.*,
  2014 WL 2115616 (E.D. Tex. May 15, 2014)...........................................................30

*CDx Diagnostic, Inc. v. U.S. Endoscopy Grp., Inc.*,
  2018 WL 2388534 (S.D.N.Y. May 24, 2018) ...........................................................18

*Corydoras Techs., LLC v. Apple Inc.*,
  2016 WL 9242435 (E.D. Tex. Nov. 23, 2016) ....................................................11, 30

*CUPP Cybersecurity, LLC v. Symantec Corp.*,
  2019 WL 1070869 (N.D. Tex. Jan. 16, 2019) .......................................2, 15, 17, 18

*Enhanced Security Research, LLC v. Juniper Networks, Inc.*,
  C.A. No. 09-871-JJF, 2010 WL 2898298 (D. Del. July 20, 2010)............................12

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011).....................................................................................................29

*Godo Kaisha IP Bridge 1 v. Intel Corp.*,
  2018 WL 5728524 (E.D. Tex. Aug. 29, 2018) ..........................................................26

*HomeBingo Network, Inc. v. Chayevsky*,
  428 F. Supp. 2d 1232 (S.D. Ala. 2006).....................................................................18

*In re Cray Inc.*,
  871 F.3d 1355 (Fed. Cir. 2017)......................................................................... passim

*In re Google LLC*,
  2018 WL 5536478 (Fed. Cir. Oct. 29, 2018).......................................................2, 15

*In re Google LLC*,
   914 F.3d 1377 (Fed. Cir. 2019)...................................................................2, 27

*In re Hoffmann-La Roche Inc.*,
   587 F.3d 1333 (Fed. Cir. 2009)........................................................................30

*In re Provider Meds, L.L.C.*,
   907 F.3d 845 (5th Cir. 2018) ...........................................................................11

*In re ZTE (USA) Inc.*,
   890 F.3d 1008 (Fed. Cir. 2018).................................................................13, 28

*Jeffrey Galion, Inc. v. Joy Mfg. Co.*,
   323 F. Supp. 261 (N.D. W. Va. 1971) ..............................................................26

*Magee v. Coca-Cola Refreshments USA, Inc.*,
   833 F.3d 530 (5th Cir. 2016) ...........................................................................18

*Moran v. Smith*,
   2016 WL 4033268 (W.D. Tex. July 27, 2016) ................................................29

*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007)......................................................................5, 9

*Nano-Proprietary, Inc. v. Canon, Inc.*,
   537 F.3d 394 (5th Cir. 2008) ...........................................................................11

*Novartis AG v. Actavis, Inc.*,
   243 F. Supp. 3d 534 (D. Del. 2017)..................................................................11

*Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*,
   2018 WL 1478047 (S.D.N.Y. Mar. 26, 2018) .............................................14, 19

*Personal Audio, LLC v. Google, Inc.*,
   280 F. Supp. 3d 922 (E.D. Tex. 2017)......................................................... passim

*Regents of Univ. of Minn. v. Gilead Scis., Inc.*,
   299 F. Supp. 3d 1034 (D. Minn. 2017)..............................................................18

*Rush v. Savchuk*,
   444 U.S. 320 (1980).........................................................................................24

*Sanofi v. Watson Laboratories Inc.*,
   875 F.3d 636 (Fed. Cir. 2017)..........................................................................29

*Scaramucci v. FMC Corp.*,
    258 F. Supp. 598 (W.D. Okla. 1966) ...........................................................................26

*SEVEN Networks, LLC v. Google LLC*,
    315 F. Supp. 3d 933 (E.D. Tex. 2018) ................................................................. passim

*Sicom Systems Ltd. v. Agilent Techs., Inc.*,
    427 F.3d 971 (Fed. Cir. 2005) ...............................................................................5, 12

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
    137 S. Ct. 1514 (2017) ....................................................................................2, 13, 27

*Uniloc USA, Inc. v. Apple, Inc.*,
    No. C 18-00360-WHA (N.D. Cal.) ...............................................................................6

*WiAV Sols. LLC v. Motorola*,
    631 F.3d 1257 (Fed. Cir. 2010) .............................................................................8, 11

**STATUTES**

28 U.S.C. § 1400(b) ........................................................................................... passim

28 U.S.C. § 1404(a) ..................................................................................................30

28 U.S.C. § 1406(a) ..................................................................................................29

35 U.S.C. § 271 .........................................................................................................28

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1), (3) and (6) ..................................................1, 3

U.S. Patent 7,016,676 ...............................................................................................28

**INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6), Defendant Google LLC ("Google")  is moving to dismiss the 14 complaints filed by Uniloc 2017 LLC ("Uniloc 2017") and Uniloc USA, Inc. ("Uniloc USA") (collectively "Uniloc") on November 17, 2018 for lack of standing, improper venue, and failure to state a claim for pre-suit indirect infringement.

Before filing this motion, Google asked Uniloc if it would agree to consolidated briefing on venue issues across its 20 pending lawsuits against Google given the common issues and to avoid burdening the Court with duplicative filings.  Uniloc declined.  Accordingly, Google is today filing nearly identical papers in Case Nos. 2:18-cv-00495, 00498, 00501, and 00502.[1]  Google anticipates filing substantially similar motions in Uniloc's remaining cases and identifying any differences therein to facilitate the Court's review.  Google would welcome any instructions the Court might provide concerning how to make the briefing process more efficient for the Court in light of the similarity of the issues presented across multiple cases.

*First,* Google moves to dismiss the complaints for lack of standing.  Uniloc and its related entities have so complicated the rights to the asserted patents that they have deprived themselves of standing to sue on them.  The complaints here name the third (and a subsequent set of complaints filed in December 2019, the fourth) permutation of Uniloc entities to sue Google.  But Uniloc still has it wrong.  To the extent Uniloc USA ever had any rights to sue Google, those rights were terminated on November 16, 2018.  Still, Uniloc USA and Uniloc 2017 brought suit against Google the very next day.  Moreover, as a result of a complicated web of agreements involving Uniloc 2017, its parent company Fortress Credit Co. LLC ("Fortress"), the original Uniloc entity Uniloc Luxembourg

---

[1] The papers in these cases are nearly identical to those filed in Case Nos. 2:18-cv-00491-494, -00496-497, -00499-500, and -00503-504.  The main difference is that certain of the motions (namely, those filed in Case Nos. 2:18-cv-00492, -00495, -00497, -00500, -00503, and -00504) add a Section IV. C, in which arguments may vary across the cases.

("Uniloc Lux"), and CF Uniloc Holdings LLC ("CF Uniloc"), Uniloc 2017 also lacks sufficient patent rights to sue Google.  Thus, neither Uniloc entity named as a plaintiff has standing.

*Second*,  Google respectfully submits venue is not proper in this District.  In the divided per curiam order declining mandamus review of *SEVEN Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933 (E.D. Tex. 2018), the Federal Circuit concluded it was "appropriate" to allow the question of venue based on servers in a district to further "percolate in the district courts."  *In re Google LLC*, No. 2018-152, 2018 WL 5536478, at *3 (Fed. Cir. Oct. 29, 2018); *see also In re Google LLC*, 914 F.3d 1377, 1379 (Fed. Cir. 2019) (Reyna, J., joined by Newman, J., and Lourie, J., dissenting from denial of petition for rehearing en banc due to the "growing uncertainty among district courts and litigants as to the requirements of § 1400(b) when conducting business virtually through servers and similar equipment in the district").  Since then, Chief Judge Lynn of the Northern District of Texas concluded that servers hosted by a third-party do not constitute a "regular and established place of business" because "[t]he business conducted from … servers involves 'electronic communications,' which the Federal Circuit specifically stated cannot constitute a place."  *CUPP Cybersecurity, LLC v. Symantec Corp.*, C.A. No. 3:18-CV-01554, 2019 WL 1070869, at *2-3 (N.D. Tex. Jan. 16, 2019); *accord* Ex. A, *BMC Software, Inc. v. Cherwell Software, LLC*, No. 1:17-cv-1074, Dkt. 55 at 4 (E.D. Va. Dec. 21, 2017) (owner of servers "does not have a physical place in this district, merely a virtual space").[2] Google respectfully submits that *CUPP* and *BMC* were correctly decided, notwithstanding this Court's conflicting decision in *SEVEN Networks*, 315 F. Supp. 3d 933 (E.D. Tex. 2018).[3]

Under *TC Heartland*, venue in a patent case is only proper (1) where the defendant resides, or (2) in a district in which the defendant has a regular and established place of business and has

---

[2] Emphasis added throughout and citations, internal quotations, and alterations are omitted unless otherwise indicated.
[3] Google also respectfully submits that *Personal Audio, LLC v. Google, Inc.*, 280 F. Supp. 3d 922 (E.D. Tex. 2017), was correctly decided, while recognizing the Court's express disagreement with that decision in *SEVEN Networks*.

committed acts of infringement.  Google, which has been organized in Delaware since the complaints were filed and has its principal place of business in California, has never resided in this District. Google does not have any place of business in this District, much less one that qualifies as "regular and established" under the standards set forth in *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). In fact, even the Google Global Cache edge servers (hereinafter referred to as GGC servers) relied upon by Uniloc and in *SEVEN Networks* to support venue are no longer operating in this District— they ceased serving traffic days after Uniloc's November 17, 2018 complaints.  And Uniloc's other venue allegations are even more attenuated: references to services Google administers remotely nationwide, including in this District; relationships with third-parties in the District; scattered equipment that may be in the District; and contacts outside the District and relevant time period. Nothing in Plaintiffs' allegations complies with the Federal Circuit's standard in *Cray*.

*Third*, Uniloc's indirect infringement claims based on pre-suit conduct should be dismissed. Uniloc does not even attempt to allege the pre-suit knowledge that is required to maintain such claims, contending instead only that "Google will have been on notice" of the asserted patents "since, at the latest, the service of this complaint upon Google."  2:18-cv-00491 Compl. ¶ 97.  That is insufficient. Uniloc has failed to state a claim for pre-suit indirect infringement.

## I.       STATEMENT OF ISSUES TO BE DECIDED (L.R. CV-7(A)(1))

1.      Should this case be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because the plaintiffs lack standing to sue?

2.      Should this case be dismissed under Federal Rule of Civil Procedure 12(b)(3) for improper venue over Google in this District?

3.      Assuming this case is not dismissed in its entirety, should Uniloc's pre-suit indirect infringement claims be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to allege knowledge of the patents?

## II.      FACTUAL BACKGROUND

### A.      The Parties

While Google's products and services are accessible across the United States, it neither resides nor has a place of business in the Eastern District of Texas.  Google is an LLC organized in Delaware. Ex. B, Orr Declaration ("Orr Decl.") ¶ 5.  Its headquarters and principal place of business is in the Northern District of California.  *Id*. ¶ 4.  Google does not own or lease "any office space, retail space, or other real property in the Eastern District of Texas."  Ex. C, Lim Declaration ("Lim Decl.") ¶ 3. Google has neither offices nor employees at offices in this District.  Orr Decl. ¶ 8.  Nor does Google possess or control any other physical place of business in this District, including where GGC servers have been located, or hold itself out as possessing or controlling such places.

Two Uniloc entities are named as plaintiffs in the 14 complaints addressed by this motion. Uniloc 2017 LLC is a Delaware limited liability company.  2:18-cv-00491 Compl. ¶ 1. Uniloc USA, Inc. is a Texas Corporation. 2:18-cv-00491 Compl. ¶ 2.  Various permutations of Uniloc entities (including Uniloc 2017, Uniloc USA, and Uniloc Licensing USA LLC) have sued telecommunications and mobile device companies for patent infringement across the country, and have previously filed and dismissed several other complaints against Google in this District.  Meanwhile, the ownership of the patents-in-suit has shifted alongside Uniloc's changing corporate and capital structure.  *See infra* Part III.A.

### B.      The Complaints

On October 1, 2018, Uniloc 2017 and Uniloc Licensing USA LLC ("Uniloc Licensing") filed four separate complaints against Google.  Then, between October 31, 2018 and November 1, 2018, Uniloc 2017, Uniloc Licensing, and Uniloc USA filed another 10 separate complaints against Google. On November 17, 2018, those initial sets of Uniloc entities dismissed the 14 complaints without prejudice and a different set of Uniloc entities—Uniloc 2017 and Uniloc USA—filed 14 new

complaints against Google on the same 14 patents that were asserted in the earlier complaints.  Then, in December 2018, Uniloc 2017 by itself filed an additional seven complaints against Google, one of which it later dismissed.  2:18-cv-00554, Dkt. 7.  In short, over the course of three months, Uniloc entities filed 35 lawsuits against Google in this District and dismissed 15, with 20 still remaining.

The 14 separate lawsuits Uniloc filed on November 17, 2018 allege that Google has infringed 14 different patents through, for example, Google Hangouts, Google Meet, YouTube, Pixel devices, and the Google Spectrum Access System.  *See, e.g.*, 2:18-cv-00491 Compl. ¶ 83; 2:18-cv-00492 Compl. ¶ 83; 2:18-cv-00493 Compl. ¶ 83; 2:18-cv-00494 Compl. ¶ 83; 2:18-cv-00495 Compl. ¶ 83.  As discussed below, all 14 complaints assert the same venue allegations, regardless of the patent asserted or the accused technology.  *See infra* Part IV.A.

## III.   PLAINTIFFS LACK STANDING TO SUE

Standing to sue at the time the suit is filed is a threshold requirement the plaintiff must satisfy in every federal action.  *Sicom Systems Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing.").  To have standing to bring a patent infringement suit, the plaintiff must suffer an injury-in-fact from a violation of its exclusionary rights.  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340-41 (Fed. Cir. 2007).  Patents are comprised of a "bundle of rights," including the right to enforce the patent—*i.e.*, to exclude others from making, using or selling products covered by the patent—and the right to license or sublicense the patent.  While a patent owner is free to divide and assign this bundle of "rights" as it sees fit, "this does not mean that the chosen method of division will satisfy standing requirements."  *Id.* at 1341, n.8.  When the division deprives a plaintiff of "substantial rights" to the patent, the plaintiff cannot meet the injury-in-fact requirement, and thus lacks standing.  *Id.* at 1340-41.  If a party lacks standing at the time of filing, the action must be dismissed.  *Sicom*, 427 F.3d at 975-976.  Neither

Uniloc USA nor Uniloc 2017 had standing when the complaints were filed and therefore all of the complaints should be dismissed.

## A.     Several Agreements Have Fractured Ownership of the Patents-in-Suit.

Each of the asserted patents has a complicated assignment history.  Many of the patents were originally assigned to Philips Electronics entities and eventually acquired by Pendragon Wireless, a non-practicing entity.  Uniloc Lux acquired nearly all of the asserted patents from Pendragon Wireless. While Uniloc Lux eventually assigned the patents to Uniloc 2017, a series of agreements between those and other entities fractured the patent rights irredeemably.[4]

In December 2014, Uniloc Lux and Uniloc USA entered into loan agreements with Fortress to finance the various Uniloc entities' patent assertion activities.[5]  Ex. D, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 168-4 ("Uniloc Lux-Fortress Agreement").   In exchange, Fortress was granted an irrevocable patent license that included the right to grant sublicenses it could use in the event of a default by Uniloc.  Ex. E, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 164-2 ("Judge Alsup Order") (citing Unilox Lux-Fortress  Agreement  §2.1).    While  that  agreement  was  amended  several  times  and terminated in May 2018 (Ex. F, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 168-19 ("Turner Deposition") at 25:18-22), Fortress—as a result of a number of defaults under the agreements described in more detail below—holds the right to grant sublicenses to all of the asserted patents.

Second, Uniloc Lux purported to assign its patent rights to Uniloc 2017 as of May 3, 2018.

---

[4] Google supports its motion with publicly available information obtained from other Uniloc litigation—including *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00360-WHA (N.D. Cal.), where a motion to reconsider Judge Alsup's decision on a motion to dismiss is pending.  Uniloc entities have sought to keep documents related to their corporate structure and patent ownership under seal, and documents on which Google relies are partially redacted.  As Judge Alsup noted, "Uniloc's manipulations in allocating rights to the patents-in-suit to various Uniloc (possibly) shell entities is perhaps designed to insulate Uniloc Luxembourg from any award of sanctions."  Ex. E, Judge Alsup Order at 10.  Whatever the reason, neither Uniloc 2017 nor Uniloc USA has standing to sue.

[5] Uniloc 2017 was formed and funded by Fortress to allow Fortress to manage the patent enforcement efforts of the Uniloc patent portfolio.  Fortress and Uniloc 2017 have overlapping personnel, including the same "authorized person" James K. Nobel III, who signed the formation documents for both companies.  *See* Exs. H-I.

Ex. G, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 120 ("Uniloc Ownership History").  That same day, Uniloc 2017 entered the first of a series of agreements with Uniloc USA and Uniloc Licensing that purportedly gave Uniloc USA the rights to sue for preexisting litigation and Uniloc Licensing the rights to sue for future litigation.  *Id.*  But Uniloc 2017 terminated both agreements on November 16, 2018, the day before Uniloc 2017 and Uniloc USA jointly filed the 14 lawsuits at issue in this motion. Ex. J, 3:18-cv-03432-JST (N.D. Cal.), Dkt. 36-1 ("Foster Declaration") at ¶ 7.

Third, Uniloc 2017 entered into an agreement with CF Uniloc in May 2018, which granted CF Uniloc certain rights that limit Uniloc 2017's ability to control enforcement and disposition of the asserted patents.  Ex. K, 3:18-cv-00360-WHA (N.D. Cal.), Dkt. 168-22 ("CF Uniloc Agreement"). Although the CF Uniloc Agreement was amended in November 2018, the specific language and date of the amendment are not publicly available.  Google is actively seeking further information about this and the two other agreements impacting ownership of the asserted patents.

### B.      Uniloc USA Has Never Had Standing to Sue on the Asserted Patents.

Uniloc USA is a named plaintiff in all 14 lawsuits at issue, but it has never had standing to sue. Uniloc USA once held an interest in litigations other than the present actions under a license with Uniloc 2017.  These interests in separate cases against different parties do not confer standing here and, even if they could, were terminated before the present actions were filed.

First, as noted above, starting on May 5, 2018, Uniloc 2017 entered into a series of licenses with Uniloc USA and Uniloc Licensing purporting to give each entity the "exclusive" right to sue with respect to the asserted patents.  Ex. F, Turner Deposition at 68:19-69:19.  Through these two licenses, Uniloc 2017 gave overlapping "exclusive" rights to both Uniloc USA and Uniloc Licensing.  *See id.* On August 28, 2018, in an effort to address this defect, Uniloc 2017 amended the Uniloc USA license to specify that Uniloc USA only had rights related to certain pre-existing litigation matters.  Ex. G, Uniloc Ownership History.  The pending suits against Google, all filed after the August 2018

amendment, fall outside the scope of the preexisting litigation for which Uniloc USA still held rights under that amendment.  Uniloc USA never had standing to sue Google.

Second, to the extent Uniloc USA ever had any rights to sue Google, they were extinguished when its license from Uniloc 2017 was terminated on November 16, 2018 (*see* Ex. J, Foster Decl. ¶ 7), purportedly to address standing issues in other pending cases, including suits against Samsung, Huawei, Cisco Systems, Microsoft, Verizon, AT&T, ESPN, Hulu, ABC, and Netflix.[6]  Despite having its license terminated on November 16, however, Uniloc USA was named as one of the plaintiffs on the 14 complaints filed against Google the very next day.

In short, at the time of filing, Uniloc USA had no rights to the asserted patents, and thus lacks standing to maintain these suits.

### C.      Uniloc 2017 Does Not Have Standing to Sue Either.

For two reasons, Uniloc 2017 also lacks standing.  First, Uniloc Lux's prior grant of rights to Fortress, including a right to sub-license "following an Event of Default," vested before Uniloc Lux purported to assign the patents to Uniloc 2017.  Second, a May 2018 agreement granted CF Uniloc rights that limit Uniloc 2017's ability to control the enforcement and disposition of the asserted patents.  Either way, Uniloc 2017 cannot maintain this action.

#### 1.      Fortress's Right to Sub-License the Asserted Patents Deprives Uniloc 2017 of Standing

If an accused infringer "has the ability to obtain" a license to the patent "from another party with the right to grant it," then the plaintiff (here, Uniloc 2017) "does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer."  *WiAV Sols. LLC v. Motorola*, 631 F.3d 1257, 1266-67 (Fed. Cir. 2010); *see also Acceleration Bay LLC v. Activision*

---

[6] While these lawsuits were filed the same day as the 14 filed against Google, they named Uniloc 2017 alone, and not Uniloc USA, in apparent recognition that Uniloc USA lacked standing to sue.

*Blizzard Inc.*, No. 16-453-RGA, 2017 WL 3668597, at *2 (D. Del. Aug. 24, 2017).  Neither a patent

owner nor a licensee has standing to sue, no matter what other rights each may hold, if it does not have

the right to exclude.  *Morrow*, 499 F.3d at 1340-41.  That is precisely the case here.  In 2014, Uniloc

Lux entered into a revenue-sharing and patent-license agreement with Fortress that granted Fortress

rights in Uniloc Lux's "existing and future acquired Patents," which includes the asserted patents, in

exchange for a money loan.  Ex. L, Uniloc Lux-Fortress Patent Security Agreement at §2(a).  As part

of the agreement, Fortress was granted an irrevocable license to the patents with the right to sub-

license, which it was free to exercise "following an Event of Default" by Uniloc Lux.  Ex. E, Judge

Alsup Order at 4, citing Uniloc Lux-Fortress Agreement §2.1.  As shown below, Uniloc Lux's repeated

defaults have resulted in Fortress obtaining the right to sub-license each of the asserted patents,

depriving Uniloc 2017 of standing.

> **a.     Multiple "Events of Default" Under the Uniloc Lux-Fortress Agreement Have Triggered Fortress's Right to Sub-License.**

Publicly available information, including a redacted copy of the relevant Uniloc Lux-Fortress

agreements, discloses multiple defaults.  The first set of known defaults relates to Uniloc Lux's failures

to meet the revenue covenant of Section 6.2.2 of the Revenue Sharing Agreement, triggering Fortress's

right to sub-license.  *See* Ex. D, Uniloc-Lux Fortress Agreement at §6.2.2.  The agreement has a

provision that required Uniloc Lux to reach a specific revenue projection by March 31, 2017.  *Id.*

Uniloc Lux failed to reach that required revenue projection.  Ex. E, Judge Alsup Order at 5; Ex. F,

Turner Deposition at 66:4-67:6, 68:15-18.

The agreement also required Uniloc Lux to reach a specific revenue projection by June 30,

2017.  Ex. E, Judge Alsup Order at 5.  Again, Uniloc Lux failed to reach the required revenue

projection.  *Id.*

Uniloc Lux's breach of a covenant requiring correct representations regarding the patent portfolio constituted another "Event of Default."   Specifically, under Article IV of the Revenue Sharing Agreement, Uniloc Lux represented that none of the patents had been determined to be invalid or unenforceable, in whole or in part, and that none was subject to any challenge to validity and enforceability.   *See* Ex. D, Uniloc-Lux Fortress Agreement at §4.5.   Uniloc Lux made these representations when the agreement was first signed on December 30, 2014, and re-affirmed the representations when it signed an amendment on May 15, 2017.   *See* Ex. D, Uniloc-Lux Fortress Agreement; Ex. M, 3:18-cv-360-WHA (N.D. Cal.) Dkt. 168-17 ("Uniloc Lux-Fortress Third Amendment").   As of May 15, 2017, however, at least 7 Uniloc patents had already been found invalid or unenforceable, in whole or in part.   At the same time, another 13 patents were already the subjects of lawsuits and re-examination proceedings.   *See e.g.*, Ex. N, 3:18-cv-360-WHA (N.D. Cal.), Dkt. 135-30 ("Summary of Uniloc Patent Challenges").   Thus, Uniloc's May 15, 2017 re-affirmation constituted an "Event of Default."

Fortress was free to exercise its sublicense rights following any one of these defaults, all of which pre-date the complaints at issue.

### b.   Fortress's Right to Sub-License Survived Both Uniloc Lux's Attempt to Cure and the Parties' Termination of the Agreement.

While Uniloc Lux and Fortress have attempted to sort out the patent rights through a series of amendments and subsequent agreements, Fortress's right to sub-license persists.   Neither the May 15, 2017 third amendment to their agreement, which Uniloc has asserted cured its defaults, nor the May 2018 termination of the agreement revoked that right.

First, the May 15, 2017 amendment did not cure all of Uniloc's defaults, nor could it.   For example, it could not cure a default that did not occur until a revenue milestone was missed a month and a half later on June 30, 2017.   Separately, Uniloc's misrepresentations concerning the validity and

enforceability of the patents were made in the May 15, 2017 amendment itself.  But under the original agreement's terms, an amendment can only cure a default if it is one "which by its express terms cures such Event of Default."  Ex. D, Uniloc-Lux Fortress Agreement at §7.3.  The May 2017 Amendment included no such express terms.  Ex. M, Uniloc Lux-Fortress Third Amendment.  As such, there are at least two events of defaults that Uniloc Lux did not cure.[7]

Second, the May 2018 termination of the Revenue Sharing Agreement did not revoke Fortress's irrevocable right to sub-license the asserted patents.  Termination of an agreement alone does not extinguish an irrevocable license, such as Fortress's here.  *See, e.g., Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) ("Based upon the unambiguous meaning of 'irrevocable,' we find that the [license] could not be terminated, notwithstanding a material breach of the agreement."); *In re Provider Meds, L.L.C.*, 907 F.3d 845, 856 (5th Cir. 2018) (explaining that the term "irrevocable . . . indicates that the license may not be revoked for any reason").

### c.      Fortress's Right to Sub-License the Asserted Patents Deprives Uniloc 2017 of Standing.

Because Fortress has an unfettered right to sublicense the asserted patents—including to Google—Uniloc 2017 "does not have an exclusionary right with respect to the alleged infringer [Google] and thus is not injured by" Google.  *WiAV Sols.*, 613 F.3d at 1266-67.  Further, it is inconsequential that Fortress may say it has no intention of sublicensing the patents to Google. *Novartis AG v. Actavis, Inc*., 243 F. Supp. 3d 534, 543 (D. Del. 2017) ("While this may establish that NPAG might choose not sublicense to, for example, Defendants, Plaintiffs identify nothing that

---

[7] In the *Apple* litigation from which many of the agreements were collected, Judge Alsup relied on the May 15, 2017 third amendment as evidence that Uniloc Lux cured its defaults.  *See* Ex. E, Judge Alsup Order at 6.  That finding is the subject of a reconsideration motion and would not be binding on this Court in any event.  But even if the third amendment cured the March 2017 revenue shortfall occurring before the amendment, that amendment could not cure the two other defaults addressed here.

deprives NPAG of the legal right to do just that."). Fortress has obtained and continues to hold the right to sub-license each of the asserted patents, and thus Uniloc 2017 does not have standing to sue.

### 2.    Uniloc 2017's Agreement with CF Uniloc Also Deprives Uniloc 2017 of Standing.

A second agreement also strips Uniloc 2017 of the rights it would need to bring suit. After termination of the Fortress revenue sharing agreement, Uniloc 2017 granted CF Uniloc rights limiting Uniloc 2017's ability to control the enforcement and disposition of the asserted patents. For example, Uniloc 2017 cannot "sell, lease, transfer, or otherwise dispose of" its patents without CF Uniloc's written consent. Ex. K, CF Uniloc Agreement at 7.1(d). Nor can Uniloc 2017 settle any litigation unless CF Uniloc, in its sole discretion, provides written consent. *See* Ex. E, Judge Alsup's Order at 8. Further, Uniloc 2017 must pay all maintenance fees for all patents, and cannot elect to discontinue payment without written consent of CF Uniloc. Ex. K, CF Uniloc Agreement at 4.9a. As such, Uniloc 2017 no longer has sufficient interests and rights in the patents to have standing to sue. *See Sicom*, 427 F.3d at 980 (finding Sicom did not have all substantial rights to patent-in-suit as it had to receive prior written consent to settle litigation and to sublicense or assign its rights.); *Azure Networks, LLC v. CSR PLC,* 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1846 (2015); *Enhanced Security Research, LLC v. Juniper Networks, Inc.,* C.A. No. 09-871-JJF, 2010 WL 2898298 (D. Del. July 20, 2010).

In sum, both Uniloc 2017 and Uniloc USA lack the necessary standing to bring suits against Google alleging patent infringement of the asserted patents. All 14 complaints must be dismissed.

### D.    If the Court Does Not Dismiss, The Case Should Be Stayed Pending Standing Discovery.

Based on the publicly available facts, Uniloc cannot meet its burden to prove it has standing to bring any of the lawsuits filed against Google. Thus, the Court should dismiss all of those complaints. But, at a minimum, the public facts show that standing is in significant doubt. Thus, if

the Court declines to dismiss (on either standing or venue grounds), Google respectfully requests that it be allowed to take immediate discovery into Uniloc's standing and that all other proceedings be stayed to resolve this threshold issue before additional resources are expended unnecessarily.

## IV.    VENUE IS NOT PROPER IN THE EASTERN DISTRICT OF TEXAS.

In a patent case, venue is proper only "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b).  "[T]he Plaintiff bears the burden of establishing proper venue." *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018).  Uniloc acknowledges that Google is organized in Delaware with a principal place of business in Mountain View, California.  2:18-cv-00491 Compl. ¶ 4.  Therefore, under *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1521 (2017), Google does not reside in this District for purposes of the patent venue statute. Moreover, as explained below, Uniloc cannot meet its burden to establish that venue is proper under the "regular and established place of business" prong of the patent venue statute.

### A.    Google Has No "Regular and Established Place Of Business" In This District.

In *Cray,* the Federal Circuit explained that for a defendant to have a regular and established place of business in a district: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." 871 F.3d at 1360.  It also cautioned courts applying this test to "be careful not to conflate showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases." *Id.* at 1361.

The first requirement of the *Cray* test, a physical place, is just that: "a building or a part of a building set apart for any purpose" or "quarters of any kind." *Id.* at 1362 (citation omitted).  The Federal Circuit emphasized that the statute "cannot be read to refer merely to a virtual space or to electronic communications." *Id.*.  Rather, there must be a "physical, geographical location in the

district from which the business of the defendant is carried out." *Id.* Moreover, that business must be carried out by employees or agents of the defendant physically present at the place of business. This is confirmed by the patent service statute, which "presumes that a defendant with a 'place of business' in a district will also have 'agents conducting such business' in that district." *Peerless Network, Inc. v. Blitz Telecom Consulting*, *LLC*, 2018 WL 1478047, at \*4 (S.D.N.Y. Mar. 26, 2018) (quoting 28 U.S.C. § 1694).

The second requirement, that the physical place of business be "regular and established," means that the business "operates in a steady, uniform, orderly, and methodical manner" and that the place where that business is carried out is "settled certainly, or fixed permanently." *Cray,* 871 F.3d at 1362-63. "[W]hile a business can certainly move its location, it must for a meaningful time period be stable, established." *Id.* at 1363.

The third requirement is that the alleged place of business be a "place *of the defendant*." *Id.* "Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id.* "Marketing or advertisements also may be relevant, but only to the extent they indicate that the defendant itself holds out a place for its business." *Id.* For example, if a defendant "lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself," that could support a finding that this requirement is met. *Id.* at 1363-64.

All three requirements must be met to establish that Google has a "place of business" in this District. *Id.* at 1362. None of Uniloc's many venue allegations meet these three requirements.

### 1.    GGC Servers Hosted by Third-Party ISPs Do Not Give Rise to a "Regular and Established Place of Business" in this District.

Google acknowledges that the Court is not writing on a blank slate when it comes to GGC servers, which form the backbone of Uniloc's venue allegations. 2:18-cv-00491 Compl. ¶¶ 20-34. In

*Personal Audio*, Judge Clark of this District held that Google's GGC servers did not create a "regular and established place of business" in view of the factors identified by the Federal Circuit in *Cray*. 280 F. Supp. 3d 922, 925, 932-35 (E.D. Tex. 2017).  In reaching that result, Judge Clark explained that "conclud[ing] that Google's business was being carried out by these servers would have far-reaching consequences that distort the scope of the statute; for example, every single AT&T tower would then possibly become a place of business for AT&T."  *Id.* at 934.  The *SEVEN Networks* decision acknowledges that it contradicts *Personal Audio* on identical facts.  315 F. Supp. 3d at 950.  And after a divided Federal Circuit panel declined mandamus review of *SEVEN Networks*, finding it "appropriate to allow the issue to percolate in the district courts," *Google*, 2018 WL 5536478, at *3, Chief Judge Lynn in the Northern District has since agreed with *Personal Audio* that servers at a third-party's data center do not constitute a "regular and established place of business."  *CUPP*, 2019 WL 1070869, at *2-3; *see also* Ex. A, *BMC*, No. 1:17-cv-1074, Dkt. 55 at 5-6 (E.D. Va. Dec. 21, 2017) ("rent[ing] a server rack from a third party" does not establish a "place of the defendant").  Google respectfully submits that the majority position is the correct one.

> **a.**    **GGC Servers Are Not Places of Business and None Are Still Operating in This District.**

GGC servers are just one part of a tiered network of computer infrastructure that allows Google to quickly and reliably deliver content to Internet users.  The core of this network is Google's data centers, which provide computation and backend storage.  Ex. O, McCallion Declaration ("McCallion Decl.") ¶ 3.  There are a handful of Google data centers in the U.S.—none in Texas.  *Id.*, Ex. C, Lim Decl. ¶ 4.  The next tier of Google's network infrastructure is known as "Edge Points of Presence" ("PoPs"), which connect Google's network to the rest of the Internet.  Ex. O, McCallion Decl. ¶ 4.  Google has no PoPs in this District.  *Id.*

The last tier of the network consists of the GGC servers or "edge nodes."  Ex. O, McCallion Decl. ¶ 5.  Local Internet Service Providers ("ISPs") host GGC servers at the ISPs' own facilities.  *Id.* ¶ 6.  If an ISP chooses to host a GGC server, then portions of certain digital content that is popular with the ISP's subscribers can be temporarily "cached" on that GGC server, relieving the ISP of the need to use medium or long-haul network capacity to fetch the content from outside its network.  *Id.* GGC servers are not necessary for the delivery of Google content to users.  *Id.* at ¶ 5.

GGC servers are not computers made by Google; rather, they are off-the-shelf computers made by third-party manufacturers and typically shipped directly to ISPs by third parties.  Ex. O, McCallion Decl. ¶ 9.  After receiving the GGC servers, the ISP unpacks, locates, installs, and hosts them in its own facility.  *Id.*  Google does not own, lease, or control the space where the servers are kept.  *Id.* ¶ 10.  No Google employee has ever seen or visited the servers in this District.  *Id.*  Indeed, Google does not have rights to physically access the spaces in which the GGC servers are stored while its service agreements with the ISPs are in force.  *Id.* ¶ 12.  And those service agreements may be terminated "at any time" for the convenience of either party.  *Id.*

In fact, the GGC servers that were located in this District ceased serving traffic on November 23, 2018, just six days after the third set of Uniloc entities refiled the first wave of complaints (asserting infringement of 14 patents).  Ex. O, McCallion Decl. ¶ 13.  The servers that were used in this District represented only a fraction of one percent of Google's total serving capacity in the United States.  *Id.* ¶ 7.  The absence of GGC servers serving traffic in this District did not cause any disruption to the delivery of content to users.  Notwithstanding *SEVEN Networks*' contrary conclusion, GGC servers cannot meet any of the *Cray* requirements, let alone all of them.

### b.      GGC Servers Are Not "Physical Places" Of Business.

Apart from *SEVEN Networks*, every decision to address servers has held that they do not constitute a physical place of business as required under *Cray*.  GGC servers are "'hardware,' the

physical electronic equipment used to operate the internet," as opposed to "'places' under the meaning of the statute," and "therefore cannot establish a regular and established place of business in this district." *Personal Audio*, 280 F. Supp. 3d at 934 (holding GGC servers are insufficient to establish venue). *BMC* similarly held that "[s]ervers are not real property; they are personal property. To the extent the servers provide 'space' from which a business may operate, any such space would be virtual space and virtual space explicitly fails the *Cray* test." Ex. A, *BMC* at 4. Most recently, in *CUPP*, the Northern District held that servers are not a "place" because the "business conducted" by servers "involves electronic communications, which the Federal Circuit specifically stated cannot constitute a place." *CUPP*, 2019 WL 1070869, at *3.

The facts here bear out these general principles. Google and ISPs enter Service Agreements, not leases, for the maintenance of GGC servers at facilities the ISPs own. Ex. O, McCallion Decl. ¶¶ 10, 12. In these Service Agreements, ISPs agree to provide rack space, power, network interfaces, and IP addresses for the servers, as well as remote assistance and installation services. *Id.* ¶ 12. The agreements therefore concern the provision of services by the ISPs, not real estate, and they do not give Google any control over physical space. Indeed, the agreements expressly put the ISPs in control of physical access to the equipment. *Id.* The only time at which the agreements authorize Google employees to enter the ISPs' premises is if the agreements are terminated. *Id.* And the only rights Google has over the GGC servers' physical location concern its ability to consent to changes that would affect the services it has contracted for, such as the ISP's relocation of a server after the ISP originally installed the server at a location the ISP's choosing. *Id.* ¶ 11.

Even if the GGC servers could be said to take up some amount of physical space, they are not "places of business" under *Cray*. Servers are pieces of equipment—like slot machines or vending machines—not places where employees conduct business—such as an office, storefront or factory.

*HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, 1250 (S.D. Ala. 2006) ("That an individual may be a part owner of a piece of equipment (in this case, a slot machine) located in a judicial district does not render the situs of that equipment his regular and established place of business for venue purposes."); *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016) (finding "vending machines are not 'sales establishments,'" and defining "establishment" as "a place of business or residence with its furnishings and staff"). "The servers themselves are not places from which [Google] conducts its business." *CUPP*, 2019 WL 1070869, at *3. That is particularly true given that the servers simply cache and transfer electronic data. Ex. O, McCallion Decl. ¶ 6. The venue statute "cannot be read to refer merely to a virtual space or to electronic communications from one person to another." *Cray*, 871 F.3d at 1362.[8]

The *SEVEN Networks* decision likened Google's GGC servers to warehouses. 315 F. Supp. 3d at 948. But unlike GGC servers, a warehouse is real property staffed by employees of the business. With respect for the Court's prior decision, Google submits a closer (though by no means perfect) analogy for a GGC server, which temporarily "caches" popular content for users, is a storage locker. But courts have found storage lockers do not qualify as places of business. *See Regents of Univ. of Minn. v. Gilead Scis., Inc.*, 299 F. Supp. 3d 1034, 1043 (D. Minn. 2017) ("Court is not persuaded that these relatively small storage lockers … constitute a sufficiently regular and established physical foothold of Gilead in Minnesota"); *CDx Diagnostic, Inc. v. U.S. Endoscopy Grp., Inc.*, No. 13-CV-5669(NSR), 2018 WL 2388534, at *3 (S.D.N.Y. May 24, 2018) (storage units are not a "place[] of

---

[8] *SEVEN Networks* concluded that the level of control exercised by Google in the physical world establishes that the physical presence of GGC servers in this District constitutes more than "merely" a virtual space or electronic communications. 315 F. Supp. 3d at 951. Google respectfully submits that the level of control discussed in *SEVEN Networks* is not borne out by the Service Agreements and that, in any event, a server fundamentally facilitates electronic communications in connection with a virtual space. While electronic communications and virtual spaces necessarily require physical hardware, that does not make physical hardware "physical places of business." *Id.* at 950. Moreover, the fact remains that Google has no access to the physical space where the servers are stored. Ex. O, McCallion Decl. ¶ 12.

business" because "no employee or agent of Defendant actually conducts business at the storage units"). Moreover, servers, unlike warehouses and storage lockers, do not store physical objects; they share electronic data, precisely what *Cray* held was insufficient under § 1400(b).[9] GGC servers are neither physical places nor places of business under *Cray*.

> c.      There Is Nothing "Regular and Established" About GGC Servers.

Even if GGC servers located on third-party ISPs' server racks were sufficient to meet *Cray*'s first requirement of a "physical place" of business, that place of business must be "regular and established." *Cray*, 871 F.3d at 1360. A regularly operating business means one that "operates in a steady, uniform, orderly, and methodical manner," while an "established" place means "settled certainly, or fixed permanently." *Id.* at 1362-63. But here, GGC servers simply store or "cache" popular digital content on a temporary basis, and cannot operate independently of a Google data center located out of the District. Ex. O, McCallion Decl. ¶¶ 5-6. Google data may move through GGC servers, but Google does not "regularly" conduct business from server racks in third-party facilities. *See Peerless*, 2018 WL 1478047, at *3-4 (finding "equipment … involved in processing calls to and from New York-based phone numbers" stored on a shelf at a third-party facility was not a "regular and established place of business").

Nor are the GGC servers "established" within *Cray*'s meaning. The ISPs are contractually authorized to move the GGC servers to different locations with Google's consent, which demonstrates the impermanent nature of the GGC servers' placement. Ex. O, McCallion Decl. ¶ 11. Moreover, the contract can be terminated "at any time" for the convenience of either party. *Id.* ¶ 12. In fact, the

---

[9] Nor does the fact that Congress made clear that ATMs are not regular and established places of business demonstrate that servers are. *Cf. SEVEN Networks*, 315 F. Supp. 3d at 962-64. Rather, Congress addressed the question presented to it by industry lobbyists seeking clarity as to particular pieces of machinery. In any event, a bank's branded ATM, which requires leasing or owning specific real property to serve customers visiting that physical location is a far cry from an anonymous server in an ISP's data center that is only accessed remotely via electronic communications.

handful of GGC servers that were previously active in this District ceased serving traffic shortly after

Uniloc filed the 14 pending suits on November 17, 2018.  The fact that personal property designed to

temporarily hold electronic data is stored on the shelf of a third party under an agreement that can be

terminated by either party at will is insufficient to establish that Google has a "permanently fixed"

"place" in this District.  *Cray*, 871 F.3d at 1363.

### d.      The ISP Facilities Hosting GGC Servers Are Not the "Place *of*" Google.

To satisfy *Cray*'s third requirement—"that 'the regular and established place of business' must

be 'the place of the defendant'"—the "defendant must establish or ratify the place of business" in

question.  *Cray*, 871 F.3d at 1363.  "Relevant considerations include whether the defendant owns or

leases the place, or exercises other attributes of possession or control over the place."  *Id*.  To begin,

GGC servers are not places; they are things.  ISPs install, store, and maintain them.  Ex. O, McCallion

Decl. ¶¶ 9, 12.  No Google employee ever even saw the GGC servers in question.  *Id*. ¶ 10.  The servers

were shipped by a third-party to the ISP, who set them up, determined where they would be placed,

and then supplied power, network interfaces, and IP addresses to the servers.  *Id*. ¶¶ 9, 12.

As for the places possibly at issue—the real estate where the GGC servers sit—Defendants

neither own nor lease the ISP facilities.  The ISPs agree to "provide" "rack space" for the equipment,

which is located "***in the Host's***" facilities—physical property locations owned or leased by the ISP.

Ex. O, McCallion Decl. ¶ 12.  For an ISP merely to provide rack space for equipment—at a physical

place of the ISP's choosing—does not give Google  a "lease" or control over the space in which the

servers sit.  In fact, Google does not even have physical access to—much less control over—the rooms

holding the racks and servers.  The racks are in the host's facilities and Google does not have a key.

*Id.*  The contract only grants Google access if the agreement is terminated and the ISP fails to deliver

the servers to Google.  *Id.*  Then, and only then, may Google enter any premises of a host where such equipment is located during normal working hours.  *Id.*

Other "[p]otentially relevant inquiries" in determining whether a location is a "place of business" of the defendant "include whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself."  *Cray*, 871 F.3d at 1363-64.  Google has done none of those things.  There is no Google "sign" or other indication on any ISP-owned or leased facility containing GGC servers that the facility is a place of business of Google.[10]  Finally, courts may consider "the nature and activity of the alleged place of business . . . *in comparison with* that of other places of business of the defendant in other venues."  *Id.* at 1364 (emphasis in original).  GGC servers are located in many judicial districts in the country, while the GGC servers in this District constituted a fraction of one percent of the total serving capacity of Google's network in the U.S.  Ex. O, McCallion Decl. ¶ 7.  On the other hand, actual Google facilities, such as its offices and data centers, are found in far fewer locations, and none are located in the District.  *Id.* ¶ 3; Ex. C, Lim Decl. ¶¶ 3-5.  GGC servers cannot provide a legally sufficient basis for venue under *Cray*.

## 2.    Uniloc's Remaining Venue Allegations Fare No Better in Locating a "Regular and Established Place of Business" in This District.

Uniloc attempts to supplement its GGC server allegations with a variety of Google services and relationships (including past relationships) that it claims establish a "regular and established place of business" in this District.  None passes the *Cray* test.

---

[10] Both *SEVEN Networks* and Uniloc's complaint point to Google Maps noting that ISPs deploy GGC servers in their network in certain metro areas in this District, suggesting that this constitutes a ratification of the ISP's location as Google's place of business.  *See SEVEN Networks*, 315 F. Supp. 3d at 966, n.51; 2:18-cv-00491 Compl. ¶ 22.  But as Google's website explains, GGC servers are deployed by network operators and ISPs (independently owned and operated businesses), not Google.  *See* https://peering.google.com/#/infrastructure (compare with Google's language regarding Data Centers that Google "operates").  Rather than associating itself with a specific place of business, such as an ISP, Google refers generally to the scope of its network infrastructure.  In fact, the places identified on Google's website are not even the locations of the ISPs, but rather the airports closest to the servers.

### a.    Google Fi and Google Voice

Uniloc points to Google's "wireless phone services called Google Fi" that Google provides to its customers "for cities such as Tyler and Marshall, TX."  2:18-cv-00491 Compl. ¶ 35.  But Google Fi is a Mobile Virtual Network Operator ("MVNO"), a cellular service provider that contracts to resell services from a cellular carrier's network (AT&T, T-Mobile, Verizon or Sprint).  Google Fi is not a "physical place" of business, such as "a building or a part of a building," but is instead a service provided to Google users.  Google Fi relies on cellular towers of other companies to transmit data; Google does not own any cell towers in this District.[11]  Ex. P, Arscott Declaration ("Arscott Decl.") ¶ 4; *see supra* Part IV.A.1.d.2.a (describing how MVNO services work).  Google does not have any exclusive rights to use the cell towers. Ex. P, Arscott Decl. ¶¶ 4-5.  And Google has no say as to where the towers are located or how they are operated.  *Id.* ¶ 5.  Thus, the Google Fi service fails at each step of the *Cray* test.  It consists of the transmission of "electronic communications," not a "physical place" of business.  *Cray*, 871 F.3d at 1362.  Because Google neither owns the cell towers, nor has any say over where the cell towers are located or how they are operated, the towers cannot be a "regular and established" place of business for Google.  *Id.* at 1362-63.  And the fact that Google does not own, lease or exercise control over the place of the cell towers means the cell towers used by Google Fi have not been established or ratified by Google as a place of business.  *Id.* at 1363.

As for Google Voice, Uniloc simply alleges that Google provides "telephone services to residents in this District" through the service by allowing individuals to select local numbers.  2:18-cv-00491 Compl. ¶ 65.  This says nothing of a physical place of business, that is regular and established, and/or ratified by Google.  Providing digital telecommunications services to residents

---

[11] Moreover, as *Personal Audio* recognized, holding that "every single AT&T tower" is "a place of business for AT&T" would "distort the scope of the statute."  280 F. Supp. 3d at 934.  Of course, Google does not even own the cell towers here; AT&T and other carriers do.

within a district, such as internet or telephone services, from a physical place outside the district does not qualify as a regular and established place of business. *See Cray*, 817 F.3d at 1362 (explaining that the patent venue statute "cannot be read to refer merely to a virtual space or to electronic communications from one person to another.").

### b.      Third-Party "Megaport" Facilities and GCI

Uniloc points to two Google Cloud platform services: Google Cloud Interconnect ("GCI") and Direct Peering. GCI and Direct Peering allow direct or very fast access to the Google Cloud network and Google servers. Ex. Q, Cha Declaration ("Cha Decl.") ¶¶ 3, 8. Uniloc alleges that "Google equipment at Megaport's facilities which provide the GCI and Direct Peering Services" are "fixed geographical locations"; "regular and established" because they operate in a "steady, uniform, orderly and methodical manner"; and "of the defendant" because Google holds contractual and/or property rights to use the space and maintain equipment. 2:18-cv-00491 Compl. ¶ 49. The facts are otherwise.

First and foremost, Megaport is not Google—it is a different company. Second, there is no "Google equipment at Megaport's facilities," as Uniloc asserts. Megaport acts as an intermediary between Google and other companies using GCI and Direct Peering services. Ex. Q, Cha Decl. ¶¶ 6, 8. Companies can run a fiber line directly into the facilities of intermediaries like Megaport. *Id.* ¶¶ 6, 8. The intermediary then transfers data between the company and Google servers at PoPs, described above, that are located outside of this District. *Id.* ¶¶ 4-5. Google does not own any portion of Megaport or own or lease any of Megaport's facilities. *Id.* ¶ 8.[12] Nor does Google provide any equipment to Megaport, or maintain or locate any of its equipment at Megaport to facilitate Megaport's

---

[12] Megaport also does not own any facilities in the District, but rather has a relationship with another company— CyrusOne—that does. Ex. Q, Cha Decl. ¶ 10. Google has no more connection to CyrusOne than Megaport. *Id.* ¶ 11.

connectivity capabilities.  *Id.*  Google simply has no presence in, or connection with Megaport that would establish a "regular and established" place of business of Google under *Cray.*[13]

### c.       Repair Centers

Uniloc alleges that Google Pixel phone owners can bring or mail broken devices to repair centers operated by uBreakiFix and Cynergy.  2:18-cv-00491 Compl. ¶¶ 51-55.  Google does not own, own an interest in, or manage uBreakiFix or Cynergy, which are independent, third-party companies.  Nor does uBreakiFix exclusively repair Google products.  Instead, it acts as a national repair service for many phone manufacturers, including Apple and Samsung.  *See* https://www.ubreakifix.com/company/about.  Google does not own or lease space at uBreakiFix.  Moreover, Google has no property or inventory at uBreakiFix. All replacement parts are owned by uBreakiFix without any control by Google.  As for Cynergy, Uniloc points to a facility in Grapevine, Texas (2:18-cv-00491 Compl. ¶ 55), which is located in the Northern District—not this District.  The fact that Google directs device owners to another separate, independent business for repair services does not establish that the repair center locations are Google's place of business.  *Cf. Cray*, 871 F.3d at 1363 ("it must be [the] place *of the defendant* … not solely a place of the defendant's employee").

### d.       Other Google Services

Uniloc points to various nationwide services as evidence of venue in this District, including Google Maps functionality; G-Suite services and Google Software-as-a-Service applications available through Google Cloud; and Waze's collection of traffic data.  2:18-cv-00491 Compl. ¶¶ 56, 62-63, 64, 66, 78.  These allegations amount to Google offering online services and collecting data via applications used by consumers nationwide, including within the District, but that does not make the

---

[13] Indeed, in the personal jurisdiction context, it is clear that the forum contacts of one company cannot be imputed to an entirely separate company. *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (the requirements of personal jurisdiction "must be met as to each defendant").  If the contacts of a third party do not suffice for personal jurisdiction, they *a fortiori* do not suffice for venue. *See Cray*, 871 F.3d at 1361.

Google application a Google place of business in this District.  *See SEVEN Networks*, 315 F. Supp. 3d at 951, n.26 (dismissing idea that "every handheld device sold by Verizon would become a place of business for Verizon" as "clearly … too far afield from the statutory text").[14]

The same goes for Google Express.  *See* 2:18-cv-00491 Compl. ¶¶ 59-60.  Google Express is a service that connects online users to popular retail stores to order the retailers' goods.  Ex. R, Krause Declaration ("Krause Decl.") ¶ 4.  Shoppers in this District can use Google Express, but Google has no employees, factories, warehouses, storage facilities or delivery fleets in the District to operate the service.  *Id.* ¶ 5.  Absent any physical Google property—real or personal—in the District, Google Express cannot constitute a regular and established place of business under *Cray*.

### e.  Operations Outside the District and Pre-Suit

Uniloc also includes allegations regarding Google's "Presence in the State," irrespective of district. 2:18-cv-00491 Compl. ¶¶ 67-78.  For example, Uniloc identifies Google Fiber services provided to residents in Austin and San Antonio, Texas, both of which are outside of this District.  *Id.* ¶ 74.  Google has also provided the State of Texas with aerial imagery and has digitized collections of books from public libraries, including the library at the University of Texas, Austin.  *Id.* ¶¶ 76-77.  Again, there is no connection to this District and certainly none sufficient to support Google having a "regular and established place of business" in this District.

Similarly, Uniloc points to office space and real estate that either are outside of this District or were closed by Google years before the complaints were filed.  Uniloc points to land purchased in Midlothian, Texas, Google offices in Austin, Texas, and an investment in a wind farm project in Oldham County, Texas.  *Id.* ¶¶ 68, 70-71, 75.  But all of these properties are located outside the District.  Google's activities outside the District have no bearing on whether Google should be subject

---

[14] For example, although individuals can use Google Maps on their personal devices while in this District, Google does not base or have any Street View cars dedicated to operate exclusively in the District.

to venue within the District.  And while Uniloc alleges that Google leased office space in Frisco, Texas from April 2012 to December 2013 (*id.* ¶ 61), "[c]ourts determine venue under § 1400(b) by the facts and situation as of the date the suit is filed."  *Godo Kaisha IP Bridge 1 v. Intel Corp.*, No. 2:17-CV-00676-RWS-RSP, 2018 WL 5728524, at *2 (E.D. Tex. Aug. 29, 2018); *accord Personal Audio*, 280 F. Supp. 3d at 931.  Thus, the canceled lease on the office space in this District years before the lawsuit was filed has no bearing on whether venue is proper in this case.

Finally, Uniloc alleges that since 2007, Google has employed "hundreds" of employees in Texas.  2:18-cv-00491 Compl. ¶¶ 69, 72.  This vague allegation, even if true, is insufficient to show that Google has a regular and established place of business specifically within the Eastern District of Texas.  And Uniloc does not present any evidence suggesting otherwise.

In sum, Google does not have any "place of business" in the Eastern District of Texas, much less one that qualifies as "regular and established" under the standards the Federal Circuit set forth in *Cray*.  None of the allegations set forth by Uniloc in its complaints support an argument otherwise.

### B. Uniloc Cannot Establish a Nexus Between Alleged Acts of Infringement and Google's Purported "Regular and Established Place of Business."

Beyond showing that a defendant has a regular and established place of business, courts have also required plaintiffs to identify a relationship between that place and the alleged acts of infringement.  *See Scaramucci v. FMC Corp.*, 258 F. Supp. 598, 602 (W.D. Okla. 1966) ("there must be some reasonable or significant relationship between the accused item and any regular and established place of business of the accused in the judicial district"); *see also Jeffrey Galion, Inc. v. Joy Mfg. Co.*, 323 F. Supp. 261, 266-67 (N.D. W. Va. 1971).  While *SEVEN Networks* concluded otherwise, that requirement is consistent with statutory history of the patent venue statute, *see Cray*, 871 F.3d at 1361 (noting § 1400(b)'s predecessor was passed to ensure "[j]urisdiction would not be conferred by '[i]solated cases of infringement' but 'only where a permanent agency is established'"),

but essential if the "regular and established place of business" prong is interpreted so broadly as to confer venue in any District a defendant's equipment is found or services used.

Uniloc's fusillade of complaints illustrates this perfectly.  As shown in the chart below, of the 14 patents asserted and technologies accused in the November complaints, none is related to any more than two of Uniloc's questionable venue allegations, most are related only to the most questionable of those allegations (e.g., web-based services accessible in the District or third-party facilities), and half of the venue allegations are unrelated to *any* case:

| Patent | GGC Servers | Google Fi Voice | Google Cloud / Peering | Repair centers | Google Maps | Google Express | Texas Real Estate | G-Suite Services | Services (imaging; books; Fiber) |
|---|---|---|---|---|---|---|---|---|---|
| 6,473,114 | NO | NO | NO | NO | NO | NO | NO | ? | NO |
| 6,952,450 | ? | NO | NO | NO | NO | NO | NO | NO | NO |
| 6,836,654 | NO | NO | NO | ? | NO | NO | NO | NO | NO |
| 6,285,892 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 7,016,676 | NO | NO | NO | NO | NO | NO | NO | NO | NO |
| 6,349,154 | NO | NO | NO | ? | NO | NO | NO | NO | NO |
| 6,329,934 | ? | NO | ? | NO | NO | NO | NO | NO | NO |
| 6,980,522 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 8,194,632 | ? | NO | NO | ? | NO | NO | NO | NO | NO |
| 6,519,005 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 6,452,515 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 8,407,609 | ? | NO | NO | NO | NO | NO | NO | NO | NO |
| 9,141,489 | NO | NO | ? | NO | NO | NO | NO | NO | NO |
| 8,949,954 | NO | NO | NO | ? | NO | NO | NO | NO | NO |

Absent a nexus requirement, allowing plaintiffs to establish venue based on a presence as attenuated as those alleged here "could essentially reestablish nationwide venue, in conflict with *TC Heartland*, by standing for the proposition that owning and controlling computer hardware involved in some aspect of company business (e.g., transmitting data) alone is sufficient," *Google*, 914 F.3d at 1381 (Reyna, J., dissenting from denial of petition for rehearing en banc), regardless of whether the asserted patent has anything to do with that computer hardware.

### C.     Uniloc Insufficiently Alleged An Act Of Infringement In This District.

In this Case No. 2:18-cv-00495 (the "495-case"), Uniloc does not plausibly allege acts of infringement in this judicial district, and thus fails to meet its burden of demonstrating proper venue. *In re ZTE (USA) Inc.*, 890 F.3d at 1013.

In the 495-case, Uniloc alleges that sharing of the Citizen Broadband Radio Service (CBRS) radio frequency band, established by the Federal Communications Commission, infringes U.S. Patent 7,016,676.  *See* 495-case Complaint ¶¶ 84, 92.  Uniloc further alleges that Google's Spectrum access system ("SAS") "enables implementation of CBRS spectrum sharing." *See id.* ¶¶ 85-97.  Google's SAS is a software process that runs on servers at Google data centers. Ex. S, Varghese Decl. ¶ 5. Google does not have any data centers located in the Eastern District of Texas (*id.*), and Uniloc does not allege so in its Complaint.  While Uniloc does allege that there are local Google Global Cache servers in the District, these do not execute any SAS software.  *See* 495-case Compl. ¶ 22; Ex. S, Varghese Decl. ¶ 6.  In addition, at the time of the Complaint and to date, Google's SAS service is not commercially available and has only been implemented for system tests, none of which were conducted in the Eastern District of Texas. Ex. S, Varghese Decl. ¶ 7.

Although Uniloc generically alleges in Paragraph 7 of the complaints that Google has "committed acts of direct and indirect infringement in the Eastern District of Texas," this allegation is conclusory, lacks support and is a mere recitation of the statutory requirements to establish venue. *Compare*  Compl. ¶ 7, *with* 28 U.S.C. § 1400(b) & 35 U.S.C. § 271.  Uniloc has not plausibly alleged direct infringement in this District in the 495-case.

Further, Uniloc fails to plausibly allege that Google induced or contributed to infringement in the Eastern District of Texas in the 495-case.  As discussed further in Part VI, the complaint does not allege pre-suit knowledge of the asserted patents.  Because knowledge of a patent is necessary for both

induced and contributory infringement, Uniloc has not plausibly alleged any indirect infringement at the time the complaint was filed in the 495-case.

In addition, Uniloc's complaint in the 495-case makes bare allegations of indirect infringement that offer boilerplate language in support.   *See* 495-case Compl. ¶¶ 93-94.   Uniloc's indirect infringement allegations cite to Google webpages that generally describe Google's SAS and sharing of the CBRS band.   *Id.* ¶ 93.   Uniloc alleges these webpages serve as evidence that Google "directly and/or indirectly intentionally instructs its customers to infringe through training videos, demonstrations, brochures, installation and/or user guides."   *Id.*   But Uniloc does not allege how Google's customers use of unspecified "devices" directly infringes the asserted patents (as is necessary to allege indirect infringement by Google), let alone in this District.   In fact, the end user or customer *cannot* infringe the patent asserted in the 495-case because its claims are allegedly directed to systems that include software operating on Google equipment, and processes that run on Google's equipment, if anywhere.   Google cannot induce or contribute to its own infringement.   *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760-61 (2011) (Section 271(b) requires that the inducer lead or persuade another to infringe); *Sanofi v. Watson Laboratories Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017) (induced infringement requires "specific intent to encourage another's infringement'").

## V.   ALTERNATIVELY, THIS ACTION SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Where venue is improper, as it is here, the district court "shall dismiss, or if it be in the interest of justice, transfer such [a] case to any district or division in which it could have been brought."   28 U.S.C. § 1406(a).   Should the Court determine that it is in the interest of justice to transfer these cases for lack of venue rather than dismissing them, Google requests that the Court transfer the cases to the Northern District of California "because 'witnesses, evidence, the underlying events, and [the defendant] are based there.'" *See Moran v. Smith*, No. 5:15-CV-1121-DAE, 2016 WL 4033268, at *2

(W.D. Tex. July 27, 2016) (quoting *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013)). Specifically, (1) the case could have been brought in the Northern District of California as Google has a "regular and established place of business" in Mountain View, California, the location of its headquarters; (2) almost all the relevant evidence and witnesses are in California, including potentially relevant Google employees; and (3) the lawsuits "call[] into question the work and reputation" of Google and its employees that conduct business in the community, which gives the Northern District of California a unique interest.  *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009). Google will also be filing separate motions to transfer under 28 U.S.C. § 1404(a), elaborating on why transfer to the Northern District of California is appropriate.

## VI.  CLAIMS OF PRE-SUIT INDIRECT INFRINGEMENT  SHOULD BE DISMISSED FOR FAILURE TO ALLEGE KNOWLEDGE OF THE ASSERTED PATENT

Both induced and contributory infringement require knowledge of the patent allegedly infringed.  *See Corydoras Techs., LLC v. Apple Inc.*, No. 2:16-CV-00538-JRG, 2016 WL 9242435, at *1 (E.D. Tex. Nov. 23, 2016) (induced infringement claim "necessarily includes the requirement that [defendant] knew of the patent"); *Babbage Holdings, LLC v. Activision Blizzard, Inc.*, No. 2:13-cv-750-JRG, 2014 WL 2115616, at *2 (E.D. Tex. May 15, 2014) (dismissing claims for induced and contributory infringement based on failure to plausibly allege knowledge).  Uniloc does not even attempt to allege pre-suit knowledge, instead claiming only that "Google will have been on notice of the [asserted patents] since, at the latest, the service of [the] complaint[s]."  2:18-cv-00495 Compl. ¶ 95.  Thus, Uniloc has failed to allege facts plausibly supporting the knowledge required for a claim of indirect infringement based on pre-suit conduct and such claims should be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss this action for lack of subject matter jurisdiction or for improper venue, or transfer it to the Northern District of California.

Dated: May 8, 2019

/s/ *Joseph Drayton, with permission by Michael E. Jones*

Joseph Drayton
NY Bar No. 2875318
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Tel:  212-479-6275
Fax:  212-479-6275
Email:  jdrayton@cooley.com

Priya B. Viswanath (admission pending)
CA Bar No. 238089
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
Tel:  650-843-5000
Fax:  650-849-7400
Email:  pviswanath@cooley.com

Rose S. Whelan
DC Bar No. 999367
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington DC  20004-2400
Tel:  202-842-7800
Fax:  202-842-7899
Email:  rwhelan@cooley.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
Tel: (903) 597-8311
Fax: (903) 593-0846

**Attorneys for Defendants Google LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 8, 2019.

*/s/ Michael E. Jones*

NAI-1507421924v1